UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| NANCY MICHAUD | CIVIL ACTION NO. 6:19-cv-01580 |
| VERSUS | JUDGE SUMMERHAYS |
| U.S. COMMISSIONER, SOCIAL SECURITY ADMINISTRATION | MAGISTRATE JUDGE HANNA |

## **REPORT AND RECOMMENDATION**

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision should be affirmed.

## **Administrative Proceedings**

The claimant, Nancy Michaud, fully exhausted her administrative remedies before filing this action. She filed an application for disability insurance benefits, alleging disability beginning on February 9, 2013,[1] which was denied.[2] She then requested a hearing, which was held on November 26, 2018 before Administrative Law Judge Carol Lynn Latham.[3] At the hearing, Ms. Michaud's disability onset date

---

[1]  Rec. Doc. 7-1 at 142.

[2]  Rec. Doc. 7-1 at 61.

[3]  A transcript of the hearing is found in the record at Rec. Doc. 7-1 at 33-59.

was amended to February 7, 2017.[4] The ALJ issued a decision on April 10, 2019, concluding that the claimant was not disabled within the meaning of the Social Security Act from the amended onset date through the date on which she was last insured.[5] Ms. Michaud asked the Appeals Council to review the ALJ's decision, but the Appeals Council found no basis for review.[6] Therefore, the ALJ's decision became the Commissioner's final decision for the purpose of judicial review.[7] Ms. Michaud then initiated this action, seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

The claimant was born on May 20, 1966.[8] At the time of the ALJ's decision, she was fifty-two years old. She has an associate degree in life sciences[9] and relevant work experience as a retail store manager.[10] She alleged that she has been disabled

---

[4]   Rec. Doc. 7-1 at 3.

[5]   Rec. Doc. 7-1 at 16-27.

[6]   Rec. Doc. 7-1 at 6.

[7]   *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[8]   Rec. Doc. 7-1 at 142.

[9]   Rec. Doc. 7-1 at 47.

[10]  Rec. Doc. 7-1 at 36-38, 168, 182, 194.

since February 7, 2017[11] due to fibromyalgia, arthritis, spinal nerve damage at C5-6, and heart problems.[12]

Based on the extensive treatment notes contained in the record, the ALJ found that Ms. Michaud has several medical conditions, some of which are severe and some of which are not severe. The ALJ found that the claimant's severe conditions are fibromyalgia, hypertension, arthritis, DeQuervains tenosynovitis, pes anserine bursitis, obesity, Baker's cyst of the left knee, cervical degenerative disc disease and stenosis, polycythemia and erythrocytosis, and bilateral trigger fingers.[13] The claimant did not challenge the ALJ's findings in that regard nor did she challenge the ALJ's residual functional capacity finding. Therefore, a lengthy review of the claimant's medical treatment is not necessary. The record contains evidence that, in the relevant time period, Ms. Michaud treated with an internist,[14] a rheumatologist,[15] a cardiologist,[16] orthopedists Kevin Lasseigne[17] and Angela Mayeux,[18] and a

---

[11]   Rec. Doc. 7-1 at 35.

[12]   Rec. Doc. 7-1 at 62-63.

[13]   Rec. Doc. 7-1 at 17.

[14]   Rec. Doc. 7-2 at 6-64.

[15]   Rec. Doc. 7-2 at 143-244, 255-277, 418-469.

[16]   Rec. Doc. 7-2 at 129-139, 279-304.

[17]   Rec. Doc. 7-2 at 325-370.

[18]   Rec. Doc. 7-2 at 70-121, 246-253, 373-416, 471-473.

dermatologist.[19] Dr. Sean Shannon, the rheumatologist, treated her for several conditions including but not limited to fibromyalgia, arthritis, bursitis, erythrocytosis, and DeQuervains tenosynovitis.[20] An MRI of Ms. Michaud's cervical spine, obtained on September 17, 2018, showed moderate left C3-4 foraminal stenosis and moderate left and mild right C5-6 foraminal stenosis.[21]

On November 26, 2018, the claimant testified at the hearing. She confirmed that she worked for nine years as the general manager of a World Market store but stopped working in February 2013. She explained that while working there she was responsible for payroll for sixteen stores. She testified that she was diagnosed with fibromyalgia in 2008 and was diagnosed with arthritis at about the same time. She said that her arthritis primarily affects her neck, hips, and hands. She stated that she now has a heart condition that was caused by medication that she took for the fibromyalgia. At the time of the hearing, she was attending physical therapy for her back and neck. She testified that she has problems with her fingers locking up, had previously had surgery on three fingers, and was scheduled to have another surgical procedure in the near future. She complained that the fibromyalgia prevents her from sleeping well and causes anxiety. She estimated that she could stand for no

---

[19] Rec. Doc. 7-2 at 306-320.

[20] Rec. Doc. 7-2 at 255-277

[21] Rec. Doc. 7-2 at 322-323.

more than thirty minutes at a time without her back muscles beginning to spasm. She estimated that she could sit for approximately thirty to forty minutes at a time and is comfortable in a recliner because it takes the pressure off her back and neck. She estimated that she could walk for about an hour at a time and could lift no more than twenty pounds. She stated that she had trouble grasping things and frequently dropped them. She also claimed to have trouble reaching overhead. She stated that the fibromyalgia caused brain fog, forgetfulness, and an inability to concentrate as well as constipation, dry eyes, and a dry mouth. She testified that she had recently been diagnosed with lupus.

 Ms. Michaud stated that she lived with her husband. She said that she could vacuum on good days, that she did her laundry in small loads, and that she usually prepared sandwiches for meals but cooked once or twice per month. She stated that she was involved with her church, attended meetings of a Bible study group and the Catholic Daughters, and that her hobby was reading. She claimed that, on good days, she could do all of her personal care activities but on bad days needed her husband's assistance. She estimated that good days and bad days were pretty evenly split, but testified that she had some kind of pain every day.

 Ms. Michaud seeks reversal of the Commissioner's adverse ruling.

## Analysis

### A. Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[22] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[23] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[24]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[25] In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[26] Conflicts in

---

[22] *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[23] *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[24] *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[25] 42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[26] *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

the evidence[27] and credibility assessments[28] are for the Commissioner to resolve, not the courts. Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[29]

**B.     Entitlement to Benefits**

The Disability Insurance Benefit program provides income to individuals who are forced into involuntary, premature retirement if they are both insured and disabled.[30] A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[31] A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education,

---

[27]     *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[28]     *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[29]     *Wren v. Sullivan*, 925 F.2d at 126.

[30]     See 42 U.S.C. § 423(a). See, also, *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019).

[31]     42 U.S.C. § 1382c(a)(3)(A).

and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[32]

## C. Evaluation Process and Burden of Proof

A five-step inquiry is used to determine whether a claimant is disabled. This process requires the Commissioner to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[33]

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[34] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[35] The residual functional capacity finding is used at the step four to

---

[32] 42 U.S.C. § 1382c(a)(3)(B).

[33] 20 C.F.R. § 404.1520.

[34] 20 C.F.R. § 404.1520(a)(4).

[35] 20 C.F.R. § 404.1545(a)(1).

determine if he can still do his past relevant work and at step five to determine whether he can adjust to any other type of work.[36]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[37] This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[38] If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[39] If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[40]

### D. The ALJ's Findings and Conclusions

In this case, the ALJ determined, at step one, that the claimant had not engaged in substantial gainful activity between February 7, 2017 (her alleged disability onset date) and December 31, 2018 (the last day on which she was insured for Social

---

[36] 20 C.F.R. § 404.1520(e).

[37] *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[38] *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[39] *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[40] *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

Security benefits). The claimant did not challenge this finding, and it is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments: fibromyalgia, hypertension, arthritis, DeQuervains tenosynovitis, pes anserine bursitis, obesity, Baker's cyst in the left knee, cervical degenerative disc disease and stenosis, polycythemia and erythrocytosis; and bilateral trigger fingers. The claimant did not challenge this finding, and it is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. The claimant did not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform sedentary work except that she can occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds; she can occasionally balance, stoop, kneel, crouch, and crawl; she is limited to frequent handling and fingering bilaterally; she is limited to no more than occasional overhead reaching bilaterally; and she should avoid all exposure to workplace hazards such as dangerous moving machinery and unprotected heights. The claimant did not challenge this finding.

At step four, the ALJ found that the claimant is not capable of performing any past relevant work. The claimant did not challenge this finding.

At step five, the ALJ found that the claimant was not disabled from February 7, 2017 through December 31, 2018 because there are jobs in the national economy that she can perform. The claimant challenged this finding.

### E. The Allegations of Error

The claimant contends that the ALJ erred (1) in finding that the claimant has transferable skills; and (2) by failing to find that the job numbers cited by the vocational expert are significant.

### F. The Claimant's Transferable Skills

According to her own testimony, Ms. Michaud's work as the general manager of a World Market store required her to oversee the payroll function for several individual stores. A vocational expert testified at the hearing in response to hypothetical questions asked by the ALJ. He opined that Ms. Michaud could no longer perform the tasks required of a general manager because that job is performed at a light level and the ALJ limited her questions to a hypothetical person with the residual functional capacity to perform only sedentary work. He further testified that Ms. Michaud had acquired skills during her employment that were transferrable to the semi-skilled sedentary positions of time keeper and payroll clerk.[41] More specifically, he opined that she had "knowledge of the payroll system and the ability

---

[41] Rec. Doc. 7-1 a 55-57.

11

to work within that system making changes, facilitating new hires, getting the pay checks issues, [and] keeping time"[42] that would transfer to the payroll clerk and time keeper positions.

The ALJ reiterated the vocational expert's testimony in her ruling, stating that "[t]he vocational expert testified there were no transferable skills to skilled, sedentary position. However, the vocational expert testified that there would be transferable skills from her past work to semiskilled positions, given the claimant's testimony about her past job duties. The vocational expert testified that the claimant's past experiences handling payroll for 15 stores supports her having the transferable skills identified above."[43]

The claimant criticized this finding by the ALJ, arguing that the ALJ's conclusion was "supported by absolutely no rationale, no discussion."[44] That is simply not the case. The ALJ relied upon the vocational expert's hearing testimony, which she explained as the rationale for her finding. "The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation,

---

[42] Rec. Doc. 7-1 at 56-57.

[43] Rec. Doc. 7-1 at 26.

[44] Rec. Doc. 7-1 at 3.

including working conditions and the attributes and skills needed."[45] Thus, it is proper for an ALJ to defer to the vocational expert's expertise in determining whether a claimant has skills that are transferrable to the jobs identified by the vocational expert.[46] When an ALJ finds that a claimant has transferable skills, the ALJ must identify the acquired work skills, the specific occupations to which the acquired work skills are transferable, and evidence that these specific jobs exist in significant numbers in the national economy.[47] The supporting evidence may consist of statements made by the vocational expert, based on his expert personal knowledge or substantiated by information contained in recognized publications.[48] Thus, the ALJ properly deferred to the expertise of the vocational expert and complied with the applicable requirements.

Furthermore, the claimant had an opportunity to question the vocational expert at the hearing, but declined to do so. She also failed to present any evidence that contradicted the expert's testimony. When a claimant offers no evidence contrary to the vocational expert's testimony, the claimant fails to meet her

---

[45] *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).

[46] *Blair v. Commissioner, Social Security Administration*, No. 6:13CV345, 2014 WL 5336483, *9 (E.D. Tex. Sept. 30, 2014).

[47] SSR 82-41, 1982 WL 31389, at *7.

[48] SSR 82-41, 1982 WL 31389, at *7.

evidentiary burden, at step five of the disability analysis, of proving that she was incapable of performing the jobs identified by the vocational expert.[49]

In this case, the ALJ applied the proper legal analysis in reaching her finding at step five, the finding was based on substantial evidence in the record, and this specification of error lacks merit.

### G. Significant Job Numbers

Ms. Michaud's second specification of error is that the ALJ's ruling did not contain any findings with respect to whether the payroll clerk and timekeeper jobs exist in significant numbers in the national economy. In her ruling, however, the ALJ expressly noted that Ms. Michaud "had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy."[50] The ALJ then explained that there are 152,990 timekeeper jobs and the same number of payroll clerk jobs in the national economy.[51] These numbers came directly from the vocational expert's testimony at the hearing.[52] Actually, the vocational expert testified that there were *150,990* payroll clerk positions and but then stated that the jobs of payroll clerk and

---

[49] *Perez v. Barnhart*, 415 F.3d at 464.

[50] Rec. Doc. 7-1 at 26.

[51] Rec. Doc. 7-1 at 26.

[52] Rec. Doc. 7-1 at 56.

timekeeper were in the same classification, for which there were *152,990* positions.[53] This Court finds that any distinction between the two numbers is likely due to either a slip of the tongue by the vocational expert or a transcription error. In either case, the ALJ was entitled to rely upon the vocational expert's testimony concerning the number of available jobs.

When an ALJ makes a finding that a claimant has transferable skills, evidence that these specific skilled or semiskilled jobs exist in significant numbers in the national economy should be provided.[54] The evidence may be in the form of statements from a vocational expert, based on his personal knowledge or substantiated in certain publications.[55] Thus, despite the claimant's argument to the contrary, it is proper for the ALJ to defer to the vocational expert on this point.

Furthermore, "[c]ourts have refused to draw a bright line standard for the minimum number of jobs required to show that work exists in significant numbers, but have generally held that what constitutes a significant number of jobs is a relatively low threshold number."[56] The number of payroll clerk and timekeeper

---

[53] Rec. Doc. 7-1 at 56.

[54] SSR 82-41, 1982 WL 31389, at *7.

[55] SSR 82-41, 1982 WL 31389, at *7.

[56] *Thomas v. Astrue*, No. 1:10-CV-472-HSO-JMR, 2012 WL 3544837, *6 (S.D. Miss. July 31, 2012), report and recommendation adopted, 2012 WL 3544846 (S.D. Miss Aug. 16, 2022) (quoting *Gurule v. Astrue*, No. 2:11-CV-96, 2012 WL 1609691, *4 (D. Vt. May 8, 2012) (internal quotation marks and citations omitted) (finding 120,000 nationwide jobs significant).

15

jobs identified in this case exceeds the number of jobs that the Fifth Circuit has found to be significant in other cases.[57]

Finally, the claimant did not cross examine the vocational expert with regard to the number of available jobs, did not suggest that the expert's testimony was unreliable, and did not present any contradictory evidence. Thus, she did not rebut the evidence presented by the expert.

Accordingly, this Court concludes that the ALJ applied the proper legal analysis in reaching her step five finding and the finding was based on substantial evidence in the record. Accordingly, this specification of error lacks merit.

## Conclusion and Recommendation

For the foregoing reasons, this Court recommends that the Commissioner's decision should be AFFIRMED and this matter should be dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

---

[57] See, e.g., *Pekrul v. Barnhart*, 153 Fed. App'x 329, 331 (5th Cir. 2005) (79,900 jobs in the national economy satisfied the significant number requirement).

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[58]

Signed in Lafayette, Louisiana, this 19th day of January 2021.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[58] See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).